

**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION
OF HUMAN RIGHTS
on the Complaint of

NICOLE LAWTONE-BOWLES,

Complainant,

v.

DELROY LAWRENCE, CITY OF NEW YORK,
DEPARTMENT OF HOMELESS SERVICES, CITY
OF NEW YORK, HUMAN RESOURCES
ADMINISTRATION,

Respondents.

---

NEW YORK STATE DIVISION
OF HUMAN RIGHTS
on the Complaint of

NICOLE LAWTONE-BOWLES,

Complainant,

v.

DELROY LAWRENCE, CITY OF NEW YORK,
DEPARTMENT OF HOMELESS SERVICES,

Respondents.

---

NEW YORK STATE DIVISION
OF HUMAN RIGHTS
on the Complaint of

NICOLE LAWTONE-BOWLES,

Complainant,

v.

CITY OF NEW YORK, DEPARTMENT OF
HOMELESS SERVICES, DELROY LAWRENCE,
JUNIUS MCMILLIAN,

Respondents.

---

**NOTICE AND
FINAL ORDER**

Case Nos. 10204650, 10204816,
10204934, 10207317

Federal Charge Nos. 16GC000470, 16GC000587, 16GC000674, 16GC002476

**PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on July 31, 2024, by Alexander Linzer , an Administrative Law Judge of the New York State Division of Human Rights ("Division"). An opportunity was given to all parties to object to the Recommended Order, and all Objections received have been reviewed.

Pursuant to 9 N.Y.C.R.R. § 465.17(c)(3), Chief of Staff Belkis Alonso-Ortiz has been designated by the Commissioner as the person who is fully empowered to decide this case.

**PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED ORDER IS HEREBY ADOPTED AND ISSUED BY BELKIS ALONSO-ORTIZ, CHIEF OF STAFF, AS THE FINAL ORDER OF THE NEW YORK STATE DIVISION OF HUMAN RIGHTS ("ORDER").** In accordance with the Division's Rules of Practice, a copy of this Order has been filed in the offices maintained by the Division at One Fordham Plaza, 4th Floor, Bronx, NY 10458. The Order may be inspected by any member of the public during the regular office hours of the Division.

**PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, <u>within sixty (60) days after service of this Order</u>. A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, NY 10458. <u>Please do not file the original Notice or Petition with the Division</u>.

**ADOPTED, ISSUED, AND ORDERED.**

DATED: 10/21/2024
      Bronx, NY

BELKIS ALONSO-ORTIZ
CHIEF OF STAFF

TO:

<u>Complainant</u>
Nicole Lawtone-Bowles

<u>Complainant Attorney</u>
Arthur Z. Schwartz, Esq.
Advocates for Justice
225 Broadway Suite 1902
New York, NY 10007

<u>Respondent</u>
Delroy Lawrence
552 East 52 Street
Brooklyn, NY 11203

<u>Respondent</u>
New York City Department of Homeless Services
150 Greenwich Street, 38th Fl
New York, NY 10007

<u>Respondent</u>
City of New York, Human Resources Administration
Office of Legal Affairs, 4 WTC, 150 Greenwich Street, 38th Floor
New York, NY 10007

<u>Respondent</u>
Junius McMillian
City of New York, Department of Homeless Services
Legal Affairs-Employment Law Div., 4 WTC - 150 Greenwich St., 38th Fl.
New York, NY 10007

<u>Respondent Attorney</u>
Gabrielle DeStefano, Esq.
City of New York, Human Resources Administration
Office of Legal Affairs, 4 WTC, 150 Greenwich Street, 38th Floor
New York, NY 10007

<u>Respondent Attorney</u>
Daniel Lorenstein, Senior Attorney
City of New York, Department of Social Services
OLA/Employment Law Division
150 Greenwich Street, 38th Floor
New York, NY 10007

Hon. Letitia James, Attorney General
Attn: Civil Rights Bureau
28 Liberty Street
New York, New York 10005

<u>State Division of Human Rights</u>
Robert Goldstein, Director of Prosecutions
Lilliana Estrella-Castillo, Chief Administrative Law Judge
Alexander Linzer , Administrative Law Judge
Michael Swirsky, Litigation and Appeals
Melissa Franco, Acting General Counsel
Elaine A. Smith, Associate Attorney, Legal Advisory
Melissa Franco, Deputy Commissioner for Enforcement
Peter G. Buchenholz, Adjudication Counsel
Matthew Menes, Adjudication Counsel
Samantha Stiles, Calendar Clerk



**NEW YORK STATE**

## Division of Human Rights

**KATHY HOCHUL**
Governor

**DENISE M. MIRANDA**
Acting Commissioner

# Notice of Important Document

| | |
|---|---|
| **ENGLISH** | **This is an important document. If you need help to understand it, please call (718) 741-8255. An interpreter will be provided free.** |
| **Español** / **Spanish** | Este es un documento importante. Si necesita ayuda para entenderlo, por favor llame al (718) 741-8255. Se le proveerá un intérprete gratis. |
| 简体字 / **Simplified Chinese** | 这是一份重要文件。 如果您需要帮助理解此文件， 请打电话至 (718) 741-8255。 您会得到免费翻译服务。 |
| 簡體字 / **Traditional Chinese** | 这是一份重要文件。如果您需要幫助理解此文件，請打電話至 (718) 741-8255。 您会得到免費翻譯服務。 |
| **Kreyòl Ayisyen** / **Haitian Creole** | Sa a se yon dokiman enpòtan. Si ou bezwen èd pou konprann li, tanpri rele: (718) 741-8255. Y ap ba ou yon entèprèt gratis. |
| **Italiano** / **Italian** | Il presente documento è importante. Per qualsiasi chiarimento può chiamare il numero (718) 741-8255. Un interprete sarà disponibile gratuitamente. |
| 한국어 / **Korean** | 이것은 중요한 서류입니다. 도움이 필요하시면, 연락해 주십시오: (718) 741-8255. 무료 통역이 제공됩니다. |
| **Русский** / **Russian** | Это важный документ. Если Вам нужна помощь для понимания этого документа, позвоните по телефону (718) 741-8255. Переводчик предоставляется бесплатно. |



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

| |
|---|
| **NEW YORK STATE DIVISION OF HUMAN RIGHTS**<br>on the Complaint of<br><br>**NICOLE LAWTONE-BOWLES,**<br>Complainant,<br>v.<br><br>**DELROY LAWRENCE, CITY OF NEW YORK, DEPARTMENT OF HOMELESS SERVICES, CITY OF NEW YORK, HUMAN RESOURCES ADMINISTRATION,**<br>Respondents. |
| **NEW YORK STATE DIVISION OF HUMAN RIGHTS**<br>on the Complaints of<br><br>**NICOLE LAWTONE-BOWLES,**<br>Complainant,<br>v.<br><br>**DELROY LAWRENCE, CITY OF NEW YORK, DEPARTMENT OF HOMELESS SERVICES,**<br>Respondents. |
| **NEW YORK STATE DIVISION OF HUMAN RIGHTS**<br>on the Complaint of<br><br>**NICOLE LAWTONE-BOWLES,**<br>Complainant,<br>v.<br><br>**CITY OF NEW YORK, DEPARTMENT OF HOMELESS SERVICES, DELROY LAWRENCE, JUNIUS MCMILLIAN,**<br>Respondents. |

**RECOMMENDED FINDINGS OF
FACT, OPINION AND DECISION,
AND ORDER**

Case Nos. **10204650, 10204816,
10204934, 10207317**

Federal Charge Nos. 16GC000470, 16GC000587, 16GC000674, 16GC002476

## SUMMARY

Complainant alleged that Respondents subjected her to sexual harassment, unlawfully discriminated against her based on age, arrest record, familial status, and status as a victim of domestic violence, failed to provide her with a reasonable accommodation for her disability, and retaliated against her for engaging in protected activity. Because the record does not support Complainant's allegations, these complaints are dismissed.

## PROCEEDINGS IN THE CASES

On September 6, 2019, Complainant filed a complaint (Case No. 10204650) with the New York State Division of Human Rights ("Division"), charging Respondent City of New York, Department of Homeless Services and Respondent City of New York, Human Resources Administration with unlawful discriminatory practices relating to employment in violation of the Human Rights Law. (ALJ's Exhibits 1, 2).

On October 17, 2019, October 24, 2019, and February 18, 2020, Complainant filed complaints (Case Nos. 10204816, 10204934, and 10207317) with the Division, charging Respondent City of New York, Department of Homeless Services with unlawful discriminatory practices relating to employment in violation of the Human Rights Law. (ALJ's Exhibits 4, 5, 7, 8, 10).

On September 22, 2020, the Division amended the complaints in Case Nos. 10204650 and 10204816 to add Respondent Delroy Lawrence, and to add additional allegations in Case No. 10204650. (ALJ's Exhibits 1, 2, 4, 5).

On February 4, 2021, the Division amended the complaint in Case Nos. 10204934 and 10207317 to add Respondent Delroy Lawrence. (ALJ's Exhibits 8, 10).

On March 11, 2021, the Division amended the complaint in Case No. 10207317 to add Respondent Junius McMillian. (ALJ's Exhibit 10).

After investigation, the Division found that it had jurisdiction over the complaints and that probable cause existed to believe that Respondents had engaged in unlawful discriminatory practices. The Division thereupon referred the cases to public hearing.

After due notice, the cases came on for hearing before Alexander Linzer, an Administrative Law Judge ("ALJ") of the Division. Virtual public hearing sessions were held on August 31, 2022, December 21, 2022, December 22, 2022, April 21, 2023, September 11, 2023, September 12, 2023, November 28, 2023, November 29, 2023, February 9, 2024, and February 29, 2024.

Complainant and Respondents appeared at the hearing. Complainant was represented by Arthur Z. Schwartz, Esq. Respondents City of New York and Junius McMillian were represented by Daniel Korenstein, Esq., Senior Attorney. Respondent Delroy Lawrence appeared *pro se*.

At the hearing, Complainant's attorney stated that Complainant does not intend to pursue claims based on age or familial status. (Tr. 338-39, 557; Respondents' Exhibit 4). Complainant's attorney also stated that Complainant is not pursuing claims in connection with an incident involving motor vehicle operator Smitty Darden alleged in the complaints. (Tr. 752).

At the hearing, the presiding ALJ granted the parties permission to file post-hearing briefs and motions for attorney's fees. (Tr. 1263). Respondents City of New York and McMillian timely filed a post-hearing brief which was considered, and where appropriate, adopted. No party submitted a motion seeking attorney's fees.

## FINDINGS OF FACT

1. Complainant is Black and female. (ALJ's Exhibits 2, 5)

2. Respondents City of New York, Department of Homeless Services and City of New York, Human Resources Administration are both departments of the City of New York that merged in 2016 and provide shelter and other services to clients (collectively Respondent "City"). (Tr. 590, 799-800, 860, 985; Respondents' Exhibit 2)

3. Respondent City maintains an equal employment opportunity ("EEO") and anti-harassment policy. (Tr. 805; Respondents' Exhibit 2)

4. Respondent City requires its employees to undergo annual training concerning its anti-harassment and EEO policy. (Tr. 805-07, 1075-76)

5. Respondent City's EEO office is responsible for investigating complaints of discrimination and responding to requests for reasonable accommodations. (Tr. 798)

6. On August 18, 2013, Respondent City hired Complainant as a motor vehicle operator. (Tr. 37; Complainant's Exhibit 1)

7. As a motor vehicle operator, Complainant's duties primarily involved driving Respondent City's homeless clients to their placement locations. (Tr. 918, 945-46, 992-93, 1055)

8. Driving a motor vehicle is an essential function of the motor vehicle operator position. (Tr. 945-46, 1055, 1060)

9. During the relevant period, Complainant's work location was 151 East 151st Street in the Bronx, New York, also known as "PATH." (Tr. 59, 741)

10. Respondent City's main transportation hub is in Brooklyn, New York. (Tr. 993)

11. Complainant is a member of a union, Local 983. In or around 2019, Complainant became a shop steward for Local 983. (Tr. 358-59)

12. On January 16, 2014, Complainant was arrested for reckless driving. (Tr. 550-51 557-62, 675-76; Respondents' Exhibits 21, 29)

13. Complainant did not report the arrest to Respondent City's Inspector General or General Counsel Offices as required by its rules. (Tr. 557-62; Respondents' Exhibit 29)

14. In 2015, Complainant had knee replacement surgery performed on her left knee. (Tr. 41)

15. In 2017, Complainant had knee replacement surgery performed on her right knee. (Tr. 44)

16. Following her surgeries, Respondent City provided Complainant with a reasonable accommodation that she would not be assigned to drive buses and would only be assigned to drive sedans or vans. (Tr. 48-49, 991-92; Complainant's Exhibit 2)

17. On October 18, 2017, Complainant filed a *pro se* complaint in the United States District Court, Southern District of New York, Case No. 17-cv-8024, alleging that Respondent City failed to provide her with a reasonable accommodation for her disability by not providing her with a "light duty" assignment and subjected her to unlawful discrimination based on gender, race, and disability, and retaliated against her for engaging in protected activity. (Tr. 409-10, 566-67; Respondents' Exhibits 3, 4)

18. Respondent City employs Respondent Lawrence as a motor vehicle supervisor. (Tr. 1134)

19. As a motor vehicle supervisor, Respondent Lawrence assigns routes to motor vehicle

- 5 -

operators and approves timesheets for Respondent City's staff. (Tr. 1135, 1170)

20. If a motor vehicle operator does not timely submit their timesheets for supervisor approval, or a supervisor does not timely approve a timesheet, the motor vehicle operator receives a physical commissioner's check instead of being paid by direct deposit. (Tr. 1170-71)

21. Respondent City's office manager located in its Brooklyn office provides overtime assignments to motor vehicle operators based on seniority. (Tr. 947, 1014, 1053-54, 1139-40)

22. Respondent Lawrence was not responsible for assigning overtime to motor vehicle operators. (Tr. 947, 1139)

23. Beginning in or around July 2018, Respondent City assigned Respondent Lawrence to PATH, where he supervised four motor vehicle operators, including Complainant. (Tr. 51, 58, 1134-36)

24. Respondent Lawrence was scheduled to work from 5:30 p.m. to 1:00 a.m., Tuesday through Saturday. (Tr. 1137-38)

25. During the relevant period, Complainant was scheduled to work 6:00 p.m. to 2:30 a.m., Sunday through Thursday. (Tr. 61, 1138)

26. During the relevant period, Respondent City employed Lynn Astacio as a director of fleet administration. Astacio oversaw the transportation of clients, staff, supplies, and laundry service for Respondent City's shelter system. (Tr. 984-85)

27. In October 2018, Respondent City employed Josette Nelson-Dabo as senior director of fleet administration. Nelson-Dabo supervised Astacio. (Tr. 986, 995)

28. On January 29, 2019, Complainant agreed to serve a 10-day suspension beginning on February 12, 2019, in connection with disciplinary charges brought against her by Respondent

City's Office of Disciplinary Affairs arising out of various allegations of workplace misconduct. (Tr. 54-57, 433-34; Complainant's Exhibit 4; Respondents' Exhibits 9, 10)

29. During the relevant period, Respondent City employed Latoya Carroll-Ford as a community associate. (Tr. 66, 1229-30)

30. Prior to February 2019, Complainant and Carroll-Ford were friends. (Tr. 66, 69, 74-75, 1144-45)

31. From before February 2019 until approximately August 2019, Respondent Lawrence was in a sexual relationship with Carroll-Ford. (Tr. 1144-47, 1198)

32. In February 2019, Respondent Lawrence and Complainant had sex in Respondent Lawrence's apartment in Brooklyn. (Tr. 60-63, 1144-47)

33. Respondent Lawrence and Complainant continued to engage in sexual relations until July 2019. (Tr. 1159-60, 1165-67; ALJ's Exhibit 10)

34. On occasion, Complainant and Respondent Lawrence would engage in sexual conduct during work hours. (Tr. 1157)

35. On occasion, because Respondent Lawrence's shift ended earlier than Complainant's, he would expect her to use personal leave so that she could leave work at the same time he did. (Tr. 61-62, 1181-83)

36. On March 7, 2019, Complainant slipped on ice while working and injured her back and neck. (Tr. 76, 79-81; Complainant's Exhibits 7, 8)

37. On March 27, 2019, Complainant filed a complaint with the Division (Case No. 10201606), alleging that she was subjected to unlawful discrimination in connection with the February 2019 suspension, among other things. (Tr. 411-12; Respondents' Exhibit 6)

38. The Division closed Case No. 10201606 on October 17, 2019, after investigation with a finding of no probable cause. (Tr. 411-12; Respondents' Exhibit 6)

39. On May 22, 2019, Respondent City's Office of Disciplinary Affairs served Complainant with disciplinary charges concerning five allegations of misconduct dating from December 2017 through February 12, 2019, including that Respondent City discovered that Complainant failed to report her January 2014 arrest as required by its rules. (Tr. 674-76; Respondents' Exhibit 29)

40. On June 20, 2019, Complainant and Respondent City agreed to settle the case Complainant filed in the Southern District of New York. Pursuant to the settlement agreement, Complainant agreed to release Respondent City from all causes of action through June 20, 2019, in exchange for a payment of $5,000.00. The settlement agreement exempted three proceedings filed by Complainant against New York City, none of which concerned the instant Division complaints. (Tr. 563-65; Respondents' Exhibit 4)

41. On July 8, 2019, Respondent Lawrence sent Complainant a text message containing an explicit image or video. Complainant testified that Respondent Lawrence sent her a video of them having sex, while Respondent Lawrence testified that he sent her a picture of his penis. Because the image of the text message in evidence is blurred, I do not credit the testimony of Complainant over that of Respondent Lawrence concerning the contents of the explicit text message. (Tr. 84-91, 1192-94, 1235; Complainant's Exhibit 9)

42. On July 10, 2019, Complainant responded to Respondent Lawrence's message with a picture of a wet cat, and Respondent Lawrence stated, "Get a brand new one." Complainant responded, "I can't stand you. 😡" (Tr. 90-91, 1193-94; Complainant's Exhibit 9)

43. Complainant testified on direct examination that she understood Respondent

Lawrence's message, "Get a brand new one," to be a reference to her vagina, because she had sent him a picture of a "pussy cat." Accordingly, I do not credit Complainant's testimony on rebuttal that she sent an image of a cat to Respondent Lawrence to indicate that she was a "scaredy-cat" because she was frightened that Respondent Lawrence would publicize a video of them having sex. (Tr. 1235; Complainant's Exhibit 9)

44. On July 11, 2019, Complainant filed a complaint with the Division (Case No. 10202862) alleging that Respondent City unlawfully discriminated against her by, among other things, withholding overtime and initiating disciplinary charges against her in May 2019. (Tr. 412; Respondents' Exhibit 7)

45. The Division closed Case No. 10202862 on January 28, 2020, because it determined that there was no probable cause to find that Respondent City engaged in the alleged conduct and that the "investigation supports Respondent's position that it did not discriminate or retaliate against the Complainant when it appropriately enforced its Code of Conduct policy via established disciplinary rules and procedures." (Tr. 412; Respondents' Exhibit 7)

46. Also on July 11, 2019, Respondent Lawrence and Complainant had a text exchange concerning Carroll-Ford. Respondent Lawrence sent a text message to Complainant stating, "What is wrong with you[.] Find something to do," because she was arguing with Carroll-Ford in the workplace. Complainant responded, "I am sick of her. You should have put her ass in check a long time ago. You keep playing with the crazy bitch. Like I said I am done. She called Al trying to tell him some shit. I am sick of her[.]" (Tr. 92, 1194; Complainant's Exhibit 9)

47. The text message exchange continued and Respondent Lawrence stated, "Think about the good dick u got yesterday and how fortunate u are some lady don't get any[.]" Complainant responded, "I can't stand you." (Tr. 93-94, 1195; Complainant's Exhibit 9)

48. On July 12, 2019, Respondent Lawrence sent a text message to Complainant stating, "Stop [] now you too mix up." Complainant' responded, "Pa I am good I know my place with you. When you want this pussy I am there. I ain't stressing over the next bitches you see. I like my dinner and dick. I am a grown ass woman you a man you have your needs. I will play my position you put me in. [Carroll] need to learn her position on Team Delroy. 😒" (Tr. 94, 1196; Complainant's Exhibit 9)

49. On or about July 31, 2019, Respondent Lawrence and Complainant stopped engaging in sexual relations with each other. (Tr. 1159-61, 1165; ALJ's Exhibit 10)

50. Complainant testified that she tried to end her relationship with Respondent Lawrence several times but that whenever she tried to stop seeing him, he retaliated against her by stopping her overtime, throwing out her doctor's notes, and not signing off on her timesheets. (Tr. 63, 94). I do not credit this testimony.

51. Complainant's testimony in which she alleged that Respondent Lawrence cut her overtime was vague and confusing. Respondent Lawrence credibly testified that he is not involved in assigning overtime to motor vehicle operators. Further, Complainant testified that Respondent Lawrence stopped signing off on her timesheets for the first time after July 2019, which is inconsistent with her testimony that he did not approve her timesheets when she attempted to end the relationship before then. (Tr. 63, 454-55, 514-15, 1139)

52. Complainant's testimony that Respondent Lawrence threatened to make her life "hell" if she did not do what he wanted her to do, made for the first time on rebuttal, was not credible. (Tr. 1233)

53. Complainant was not a credible witness because her testimony was frequently vague, evasive, contradictory, and combative. (Tr. 49-50, 258, 300-01, 354-55, 370-73, 493-94, 498-

503, 506-07, 510-13, 537-39, 1232-34, 1241-44, 1248-49)

54. Respondent Lawrence was a credible witness based on his demeanor and his direct responses to questions during his testimony. However, Respondent Lawrence's credibility is not to his credit. Respondent Lawrence admitted to engaging in sexual conduct with Complainant during work hours, demonstrated a lack of remorse for conduct that he acknowledged is against Respondent City's rules and showed a general lack of respect towards Complainant and women in general. For example, Respondent Lawrence testified, "I didn't give [Complainant] no more . . . of my dick, so she got mad . . ." (Tr. 1157, 1162-63, 1181-83, 1195, 1200)

55. I credit Respondent Lawrence's testimony that he and Complainant were in a consensual relationship from February 2019 through July 2019. Respondent Lawrence's testimony that the relationship was consensual is consistent with Complainant's allegation in her complaint that Carroll-Ford and Respondent Lawrence "dated prior to him and I," and that she told Respondent Lawrence that she was not going to see him anymore because [Carroll] was spreading "vicious rumors." (ALJ's Exhibit 8)

56. I do not credit Complainant's testimony that Respondent Lawrence promised to try to help her avoid being fired if she slept with him. Respondent Lawrence credibly denied the allegation. In addition, although Complainant filed Division complaints on September 6, 2019, October 17, 2019, and October 24, 2019, containing wide-ranging allegations concerning multiple individuals, none of those complaints contained this allegation. It was not until Complainant filed her Division complaint on February 18, 2020, that she raised this allegation for the first time. (Tr. 62-63, 510-13, 1175-77; ALJ's Exhibits 2, 5, 8, 10)

57. Complainant testified that, after July 2019, Respondent Lawrence stopped signing off on her timesheets so that she would have to pick up commissioner's checks from Brooklyn

instead of receiving direct deposit. Complainant testified Respondent Lawrence delayed her paychecks in October, November, and December 2019, but did not identify any specific instance where she received a commissioner's check. (Tr. 449-52).

58. I do not credit Complainant's testimony in this regard. Astacio credibly testified that Complainant complained on two occasions in 2019 that Respondent Lawrence had not timely approved her timesheet, and that, on both occasions, the timesheet was not approved because Complainant did not use correct time and leave entries. (Tr. 1064-65)

59. On July 31, 2019, Complainant obtained a letter from her medical provider stating that she should avoid driving for more than 1.5 hours at a time. (Tr. 102-06; Complainant's Exhibit 12; Respondents' Exhibit 15)

60. On August 1, 2019, Complainant submitted a request for a reasonable accommodation in the form of a desk job to Respondent City's EEO office. (Tr. 121-23; Complainant's Exhibit 19)

61. On August 28, 2019, Respondent City's Office of Legal Affairs sent a letter to Complainant advising that it was in receipt of complaints and concerns that she submitted to Respondent City. The letter also stated that Respondent City was aware that Complainant sent repetitive e-mails concerning her complaints and concerns to senior leadership and outside law firms and had inappropriately insulted and name-called management. Respondent City directed Complainant to stop the conduct and advised her to send her complaints directly to the Office of Legal Affairs. (Tr. 288-90; Complainant's Exhibit 50)

62. On August 29, 2019, following a July 18, 2019, informal conference concerning the May 2019 disciplinary charges against Complainant, hearing officer Petal Harlow of Respondent City's Office of Disciplinary Affairs issued a letter finding that charges against Complainant had

been established and recommending that Complainant's employment be terminated. (Tr. 675-76; Respondents' Exhibit 31)

63.  Respondent City did not implement the hearing officer's recommendation and Complainant's employment was not terminated. (Tr. 660-61)

64.  On September 16, 2019, Respondent City sent Complainant a letter stating that her August 1, 2019, request for a reasonable accommodation in the form of a desk job was denied and advising her of her right to appeal. (Tr. 121-23, 838-41; Complainant's Exhibit 19)

65.  On October 7, 2019, Respondent City hired Respondent McMillian as a motor vehicle supervisor at PATH. (Tr. 909)

66.  Respondent McMillian supervised Complainant, although Respondent Lawrence remained her senior supervisor. (Tr. 917, 970)

67.  On October 8, 2019, Complainant was examined by her medical provider who provided her with a letter stating that she should not drive for more than 1.5 hours continuously and "would benefit from desk work." (Tr. 114-15, 422; Complainant's Exhibit 17)

68.  Complainant provided this letter to Respondent City. (Tr. 528-32; Complainant's Exhibit 17; Respondents' Exhibit 15)

69.  On October 13, 2019, Respondent City's Office of Disciplinary Affairs served Complainant with disciplinary charges alleging that she continued to send disparaging and harassing emails outside of her chain of command after Respondent City's Office of Legal Affairs directed her to stop on August 28, 2019. Respondent City alleged that Complainant engaged in numerous instances of misconduct, including: sending a disparaging email to 30 addresses on October 10, 2019, stating that Nelson-Dabo has an "unclean and tainted [past]" and that Nelson-Dabo and Astacio "needed to be removed"; publishing inappropriate tweets on her

- 13 -

twitter account; speeding while driving for work, and engaging in multiple instances of disrespect in the workplace, among other allegations. (Tr. 147-56, 629-40; Complainant's Exhibits 24, 25; Respondents' Exhibits 23-25)

70.   As a result of the charges, Complainant was immediately suspended from October 13, 2019, to October 19, 2019.  The charges remained pending following the suspension.  (Tr. 148, 168; Complainant's Exhibits 24, 28)

71.   On October 13, 2019, Complainant sent a memorandum to Respondent City's deputy commissioner, Denise Deprima, alleging that Astacio and a motor vehicle supervisor named Kevin Flanagan had made her life a "living hell," that a White male motor vehicle operator named Dennis Toban was allowed to work a desk job until he got his driver's license back after it was suspended, and that Respondent City was discriminating against her based on numerous protected categories.  Complainant did not mention Respondent Lawrence in the memorandum. (Tr. 160-62; Complainant's Exhibit 26)

72.   On October 15, 2019, Complainant received a letter from her doctor stating that Complainant was advised to avoid driving and squatting for more than 1.5 to 2 hours at a time. (Tr. 163-66; Complainant's Exhibit 27)

73.   On November 18, 2019, following an informal conference concerning the October 13, 2019, disciplinary charges against Complainant, hearing officer Jammin Lewis of Respondent City's Office of Disciplinary Affairs recommended that Complainant's employment be terminated.  (Tr. 675-76; Respondents' Exhibit 28)

74.   Respondent City did not implement the hearing officer's recommendation and Complainant's employment was not terminated.  (Tr. 660-61)

75.   Beginning in mid-November 2019, Complainant took a leave of absence from work.

*- 14 -*

(Tr. 927)

76. On November 25, 2019, Respondent City sent a letter to Complainant requesting additional information concerning her medical restrictions. (Tr. 174; Complainant's Exhibit 30)

77. On November 26, 2019, at approximately 3:00 a.m., Complainant sent an email to Nelson-Dabo complaining that she was being retaliated against and subjected to sexual harassment and stating that she is unable to drive. (Tr. 175-77; Complainant's Exhibit 31)

78. That afternoon, Astacio wrote an email to Complainant advising that her timesheet was not approved because she did not submit a doctor's note for an absence on November 17, 2019, and because she inappropriately included four more hours of comp time than she was entitled to take in connection with attending a disciplinary conference. (Tr. 186-89, 1049-52; Complainant's Exhibit 32)

79. The same day, Complainant responded to Astacio, copying numerous individuals including Nelson-Dabo and Respondents McMillian and Lawrence, stating that she had submitted three doctor's notes to Respondent City's EEO office stating that she is unable to drive and alleging that Respondent Lawrence stated to her, "Quit [Nelson-Dabo] has a target upon ya back anyway. I tried to keep ya out of trouble but you don't listen. Ya don't do what I told ya to do. I give ya dick to calm ya down. Ya don't want that." (Tr. 189-90; Complainant's Exhibit 33)

80. Complainant's November 26, 2019, email was the first time that Astacio or Nelson-Dabo learned that Complainant had alleged that Respondent Lawrence acted inappropriately towards her. (Tr. 1046-47)

81. On November 27, 2019, Nelson-Dabo sent an email to Complainant stating that she had forwarded Complainant's email to Respondent City's EEO and legal departments. (Tr. 1048-49;

Complainant's Exhibit 34)

82. That day, Complainant responded by email stating, "I have recorded everything [Respondent Lawrence] said to me and done to me on recording and video. I have been sexually harassed by him, discriminated by him and people have witnessed what he has done to me. Yet you put me in danger of losing my job and refuse to give me reasonable accommodations . . ." (Tr. 196-97; Complainant's Exhibit 35)

83. During the relevant period, Respondent City employed Rae Davis-Williams as a reasonable accommodation coordinator. (Tr. 813)

84. On December 1, 2019, Complainant sent an email to Davis-Williams stating that she was unable to drive and required a desk job. Complainant wrote, "You put clients at risk by letting me drive because I can't feel my driver knee and leg after driving for hours. You keeping me on the road is an accident waiting to happen." (Tr. 208-10; Complainant's Exhibit 36)

85. On December 12, 2019, Complainant obtained an order of protection from New York State family court ordering Respondent Lawrence to refrain from assaulting, harassing, stalking, or engaging in any criminal offense towards her. The order of protection did not require Respondent Lawrence to avoid being in proximity to Complainant. (Tr. 213-15; Complainant's Exhibit 37)

86. On December 12, 2019, Complainant obtained a letter from her medical provider stating that she should avoid driving and "would benefit from desk work." (Tr. 217-18; Complainant's Exhibit 38)

87. Respondent City's EEO office contacted Complainant's program area concerning her accommodation request and was advised that Complainant was a motor vehicle operator and the department needed her to drive to transport clients. (Tr. 860)

88. Respondent City was unable to accommodate Complainant's request to be assigned to a desk job permanently because she was hired as a driver and was not a clerical employee. (Tr. 1060)

89. On December 23, 2019, Complainant submitted a request to take Family and Medical Act leave for the period December 8, 2019, through March 2, 2020. That day, Respondent City provided Complainant with paperwork to fill out and submit in order to be approved for leave. (Tr. 259-61; Complainant's Exhibit 44)

90. On December 31, 2019, Davis-Williams sent a letter to Complainant stating that Respondent City was prepared to grant her a reasonable accommodation in the form of 10 to 15 minute breaks on long distance transportation runs that exceed 1.5 hours one way. Davis-Williams requested that Complainant return to work immediately if she was able to perform her job duties within those parameters. (Tr. 843-46; Respondents' Exhibit 13)

91. In her letter, Davis-Williams also stated that if Complainant was unable to perform her duties under those circumstances, that she should provide updated medical information identifying her inability to work and the duration that she would need to be off from work. Davis-Williams also asked Complainant to provide medical documentation to support her statement that she cannot drive because she is on medication, which Complainant had not provided. (Tr. 843-46; Respondents' Exhibit 13)

92. On January 1, 2020, Complainant reported to work for the first time since mid-November 2019. (Tr. 45, 297-98, 926-27; ALJ's Exhibit 10)

93. Complainant arrived at work using a walker, sat at her desk, and began printing papers. (Tr. 956-59)

94. Respondent McMillian, who was working that day, handed Complainant vehicle keys and Complainant looked at him. Respondent McMillian said to Complainant, "Are you here to work, because I need to know so I can call . . . my supervisors and let them know. If you're not here to work, then I need to let this be known because you're here to take clients to placements. You're not to sit here." (Tr. 926-27)

95. Complainant continued to look at Respondent McMillian. (Tr. 927)

96. Respondent McMillian then called Nelson-Dabo concerning Complainant. Nelson-Dabo dispatched a manager to PATH, who asked Complainant to leave because she was unable to drive. (Tr. 927-31)

97. I do not credit Complainant's testimony that Respondent McMillian ranted at her like a "madman," told her that she should go on social security if she cannot drive, told her that she was fired, and threw keys at her. Complainant's testimony was confusing and vague, and Respondent McMillian credibly denied the allegations. (Tr. 299-301, 527-28, 537-39, 927-34)

98. On January 2, 2020, Davis-Williams sent an email to Complainant stating again that Respondent City would accommodate the restriction of breaks every 90 minutes while driving. (Tr. 271-73; Complainant's Exhibit 46)

99. Complainant responded by email that she was unable to drive because of medication that she was taking, advised that she had provided medical documentation, and requested that Respondent City provide her with a desk job. (Tr. 273-76; Complainant's Exhibits 47, 48)

100. On an unspecified occasion, Respondent City allowed Dennis Toban, a motor vehicle operator, to temporarily perform messenger work for a period of three months while he was waiting for his suspended license to be reinstated. (Tr. 1060-61)

101. Complainant received worker's compensation for permanent partial disability from January 1, 2020, to August 4, 2021, in connection with her March 7, 2019, fall. (Tr. 247, 290-91; Complainant's Exhibit 51)

102. On January 27, 2020, Respondent City wrote a letter to Complainant stating that she failed to complete the Family and Medical Leave Act package that was provided to her on December 23, 2019, and that her leave request was disapproved. Respondent City stated that it considered Complainant to be absent without official leave, effective January 8, 2020. (Tr. 304-05, 311-12; Complainant's Exhibits 54, 55, 56)

103. On January 29, 2020, Respondent City's Office of Disciplinary Affairs sent a letter to Complainant stating that she was absent without official leave and must either immediately submit updated medical documentation, report to work, or submit her resignation by February 6, 2020. (Tr. 313-14; Complainant's Exhibit 57)

104. In response to Respondent City's January 29, 2020, letter, Complainant stated that she would not return to PATH and would not resign. (Tr. 314-15)

105. In February 2020, Respondent City's Office of Disciplinary Affairs served Complainant with disciplinary charges because she was absent without leave. (Tr. 315-16, 323-26; Complainant's Exhibits 58, 60)

- 19 -

106. The hearing in connection with the February 2020, disciplinary charges was suspended due to the COVID-19 pandemic. As of the date of the instant public hearing, it had not been held. (Tr. 316-17)

107. As of the public hearing, Respondent City had not terminated Complainant's employment, and she remains absent without official leave. (Tr. 661)

## OPINION AND DECISION

As an initial matter, Complainant stated that she does not intend to pursue claims based on age or familial status. Those claims are dismissed.

Complainant's four complaints contain wide-ranging allegations involving over twenty individuals dating back to 2013. N.Y. Exec. Law, art. 15 ("Human Rights Law") § 297.5 provides: "Any complaint filed pursuant to this section must be so filed within one year after the alleged unlawful discriminatory practice." This provision acts as a mandatory statute of limitations in these proceedings. *Murphy v. Kirkland*, 88 A.D.3d 267, 273, 928 N.Y.S.2d 333, 337 (2d Dept. 2011). Complainant filed her first complaint on September 6, 2019. Accordingly, unless Complainant establishes that the continuing violation doctrine applies, claims arising out of events which occurred before September 6, 2018, are time-barred.

"[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Clark v. State of New York*, 302 A.D.2d 942, 945, 754 N.Y.S.2d 814, 817 (4th Dept. 2003) (citation omitted).

A hostile work environment claim "is predicated on a series of separate acts that

collectively constitute an unlawful discriminatory practice." *Lozada v. Hook*, 151 A.D.3d 860, 861, 54 N.Y.S.3d 688 (2nd Dept. 2017) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). The statute of limitations requires that only one harassing act occur within the statutory period and, "once that is shown, a court . . . may consider the entire time period of the hostile environment in determining liability." *Id.* at 862, 54 N.Y.S.3d 688 (quoting *Strauss v. New York State Dept. of Educ.*, 26 A.D.3d 67, 69, 805 N.Y.S.2d 704 (3d Dept. 2005)). However, such claims will be time-barred if the acts are not part of the same unlawful practice or if none of the acts occurred within the statutory time period. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 122.

Complainant's claims are time-barred to the extent they concern alleged conduct occurring prior to September 6, 2018. Complainant did not offer evidence establishing that her allegations concerning conduct that occurred before September 6, 2018, involved specific and related instances of discrimination to conduct alleged to have occurred within the statutory period. Those claims are dismissed.

Claims Raised in Dismissed Division Complaints or Released

Complainant's claims are dismissed to the extent the claims were raised in Complainant's Division complaints filed on March 27, 2019, and July 11, 2019, which the Division dismissed after its investigations determined that there was no probable cause to find that Respondent City engaged in the alleged discriminatory practices. The dismissed claims include Complainant's claims relating to her suspension in February 2019, and claims related to the May 20, 2019, disciplinary charges, including Complainant's claims that Respondent City unlawfully discriminated against her based on her arrest record when it served her with charges for failing to report that arrest. These claims are dismissed.

Complainant's claims against Respondents are also dismissed to the extent they were released in the June 20, 2019, settlement agreement executed by Complainant and Respondent City. The release contained in the settlement agreement is plain and unambiguous, and released Respondents from any causes of action occurring up through the date of the agreement. *See Goode v. Drew Bldg. Supply, Inc.*, 266 A.D.2d 925, 697 N.Y.S.2d 417 (4th Dept. 1999). These claims are dismissed. Complainant's claims concerning Respondent Lawrence are not dismissed, as the alleged conduct continued beyond June 20, 2019.

<u>Reasonable Accommodation</u>

Complainant alleged that Respondents failed to accommodate her inability to drive by providing her with a desk job. It is an unlawful discriminatory practice for an employer to refuse to provide a reasonable accommodation to an employee's known disability. Human Rights Law § 296.3(a). To establish a case of disability discrimination based upon an employer's failure to provide a reasonable accommodation, Complainant must show that 1) she had a disability within the meaning of Human Rights Law § 292.21, 2) Respondents had notice of the disability, 3) with reasonable accommodation Complainant could perform the essential functions of the position, and 4) Respondents refused to make such an accommodation. *See Abram v. N.Y. State Div. of Human Rights*, 71 A.D.3d 1471, 1473, 896 N.Y.S.2d 764, 767 (4th Dept. 2010).

The Human Rights Law defines the term "disability" as "a physical, mental or medical impairment . . . which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or . . . a condition regarded by others as such an impairment . . ." Human Rights Law § 292.21. This definition has been interpreted to include any medically diagnosable impairments and conditions which are merely "diagnosable medical anomalies which impair bodily integrity and thus may lead to more serious

conditions in the future." *State Div. of Human Rights v. Xerox Corp.,* 65 N.Y.2d 213, 219, 491

N.Y.S.2d 106, 109 (1985).

Pursuant to the implementing regulations of the Human Rights Law, "[o]nly those

disabilities which actually impede, as a matter of fact, the individual in performing the job will

give rise to a consideration of accommodation. This is understood to include those situations in

which the job impedes the individual's recovery or ability to obtain treatment, and

accommodation can make recovery or treatment possible while the individual continues to be

employed." 9 N.Y.C.R.R. § 466.11(c)(3).

Forms of reasonable accommodation include but are not limited to "making existing

facilities more readily accessible to individuals with disabilities; acquisition or modification of

equipment; job restructuring; modified work schedules; adjustments to work schedule for

treatment or recovery; reassignment to an available position; adjustment of examinations,

training materials or policies; providing readers or interpreters." 9 N.Y.C.R.R. § 466.11(a)(2).

Once the need for accommodation is known or requested, the employee and the employer are

required to engage in an interactive process, which includes the discussion and exchange of

pertinent medical information, to arrive at a reasonable accommodation which will allow a

disabled employee to perform the necessary job requirements. *See Pimentel v. Citibank, N.A.,* 29

A.D.3d 141, 148-49, 811 N.Y.S.2d 381, 387 (1st Dept. 2006), *lv denied,* 7 N.Y.3d 707, 821

N.Y.S.2d 813 (2006); *Vinikoff v. N.Y. State Div. of Human Rights,* 83 A.D.3d 1159, 1162, 920

N.Y.2d 458, 461 (3d Dept. 2011) "The employer has a duty to move forward to consider

accommodation once the need for accommodation is known or requested. The employer has the

duty to clearly request from the applicant or employee any documentation that is needed." 9

N.Y.C.R.R. § 466.11(j)(4). "The employer's decision to engage in or forgo an interactive

process is but one factor to be considered in deciding whether a reasonable accommodation was available for the employee's disability at the time the employee sought accommodation." *Jacobsen v. N.Y. City Health & Hosps. Corp.*, 22 N.Y.3d 824, 838, 968 N.Y.S.2d 86, 96 (2014). An accommodation is not reasonable if it imposes an undue hardship on Respondent. Human Rights Law § 296.3(b); 9 N.Y.C.R.R. § 466.11(b)(2).

Complainant is employed as a motor vehicle operator. In November 2019, after receiving a doctor's letter from Complainant, Respondents granted her a reasonable accommodation in the form of providing her with breaks every 90 minutes while driving. Complainant subsequently provided documentation stating that she should avoid driving. Complainant also advised that she was on medication that prevented her from driving and requested that she be assigned to a desk job. Respondents denied Complainant a reasonable accommodation in the form of a permanent desk job, but did offer her a leave of absence, provided she submit appropriate documentation. Respondents did not violate the Human Rights Law by refusing to assign Complainant to a desk job. As a motor vehicle operator, one of the essential functions of Complainant's position is driving motor vehicles. The Human Rights Law does not require an employer to "find another job for the employee or to create the job, or to reassign if no position is open." *Pimentel*, 29 A.D.3d at 148, 811 N.Y.S.2d at 386.

On one unspecified occasion, Respondent City permitted Toban, a motor vehicle operator, to work as a messenger for three months while his license was suspended. In contrast to Toban's temporary assignment, Complainant requested a desk job for an indefinite period, and Respondents determined that they could not accommodate the request. This claim is dismissed.

Discrimination

It is unlawful for an employer to discriminate against an employee on the basis of race or status as a victim of domestic violence. Human Rights Law § 296.1(a). To make out a prima

facie case of unlawful discrimination in employment, a complainant must show that 1) she is a member of a protected class, 2) she was qualified for the position, 3) she suffered an adverse employment action, and 4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305, 786 N.Y.S.2d 382, 390 (2004) (citing *Ferrante v. Am. Lung Ass'n*, 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 29 (1997)).

An adverse employment action requires "a materially adverse change in the terms and conditions of employment." *Forrest* at 306, 786 N.Y.S.2d at 391. This might be indicated by "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.*, quoting *Galabya v. New York City Board of Education*, 202 F. 3d 636, 640 (2d Cir. 2000).

If a complainant makes out a prima facie case of unlawful discrimination, the burden shifts to the respondent to articulate a legitimate, independent, and non-discriminatory reason for its actions. *Id.* at 305, 786 N.Y.S.2d at 390-391. If the respondent does so, the complainant must show that the reasons presented by respondent were merely a pretext for the unlawful discrimination by demonstrating both that the respondent's stated reasons were false and that the real reason was unlawful discrimination. *Id.* at 305, 786 N.Y.S.2d at 391. The "burden of persuasion of the ultimate issue of discrimination always remains" with the complainant. *Stephenson v. Hotel Empls. and Rest. Empls. Union Local 100 of the AFL-CIO*, 6 N.Y.3d 265, 271, 811 N.Y.S.2d 633, 636 (2006).

As an initial matter, Complainant failed to establish that she was a victim of domestic violence, and this claim is dismissed. *See* Human Rights Law § 292.34. Complainant is a

member of a protected class because she is Black.  Complainant was subjected to an adverse employment action when Respondent City brought disciplinary charges against her on October 13, 2019, and in February 2020.  However, aside from Complainant's conclusory allegations, there is no evidence of discriminatory animus on the part of Respondent City based on Complainant's race.  This claim is dismissed.

Sexual Harassment

Complainant alleged that Respondents subjected her to *quid pro quo* sexual harassment. "*Quid pro quo* harassment occurs when unwelcome sexual conduct . . . is used, either explicitly or implicitly, as the basis for employment decisions affecting compensation, terms, conditions, or privileges of the complainant's employment." *Father Belle Cmty. Ctr. v. New York State Div. of Hum. Rts. on Complaint of King*, 221 A.D.2d 44, 50, 642 N.Y.S.2d 739, 744 (4th Dept. 1996) (citation omitted); *see also Mauro v. Orville*, 259 A.D.2d 89, 91–92, 697 N.Y.S.2d 704, 707 (3d Dept. 1999).  "The issue in a *quid pro quo* case is whether the supervisor has expressly or tacitly linked tangible job benefits to the acceptance or rejection of sexual advances; a *quid pro quo* claim is made out whether the employee rejects the advances and suffers the consequences or submits to the advances in order to avoid those consequences.  Because the focus is on the prohibited conduct—the unwelcome sexual overtures—and not on the victim's reaction to it, there is no requirement that the victim suffer actual economic loss." *Father Belle Cmty. Ctr.*, 221 A.D.2d at 50, 642 N.Y.S.2d at 744 (citations omitted).  Liability for *quid pro quo* harassment is always imputed to the employer. *Id.*, 221 A.D.2d at 52, 642 N.Y.S.2d at 745.

The evidence established that Respondent Lawrence and Complainant engaged in a consensual sexual relationship from February 2019 through July 2019.  Complainant was not

credible when she testified that Respondent Lawrence threatened her, cut her overtime, or refused to sign her timesheets in retaliation for her attempting to end the relationship. Respondent Lawrence engaged in inappropriate conduct by engaging in a relationship with his direct report, including during working hours, and his testimony demonstrated a lack of remorse for his conduct. However, the record is devoid of credible evidence that Respondent Lawrence pressured Complainant into a sexual relationship. The factual conclusion that Complainant's relationship with Respondent Lawrence was consensual is, ultimately, fatal to her claim of *quid pro quo* sexual harassment. *Bracci v. New York State Div. of Hum. Rts.*, 62 A.D.3d 1146, 1148, 878 N.Y.S.2d 830, 832 (3d Dept. 2009). This claim is dismissed.

Complainant alleged that Respondents subjected her to a hostile work environment based on sex. For claims accruing prior to October 11, 2019, in order to establish a hostile work environment claim under Human Rights Law § 296.1(a), Complainant must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment. *Forrest*, 3 N.Y.3d at 310, 786 N.Y.S.2d at 394 (quoting *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21, 114 S.Ct. 367 (1993)). Whether an environment is hostile or abusive can be determined only by looking at all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." *Id.* at 311 (quoting *Harris,* at 23). "Moreover, the conduct must both have altered the conditions of the victim's employment by being subjectively perceived as abusive by the plaintiff and have created an

objectively hostile or abusive environment--one that a reasonable person would find to be so." *Id.* at 311, 786 N.Y.S.2d at 395 (quoting *Harris*, at 21). Complainant must show that the discriminatory conduct occurred because of her protected class membership. *See Arcuri v. Kirkland*, 113 A.D.3d 912, 914, 978 N.Y.S.2d 439, 441 (3d Dept. 2014).

Complainant failed to establish that she was subjected to a hostile work environment based on sex. In light of the evidence that Complainant entered into a consensual relationship with Respondent Lawrence, Complainant failed to establish that Respondent Lawrence's conduct created a subjectively or objectively hostile or abusive environment. This claim is dismissed.

Pursuant to the amendment to the Human Rights Law effective October 11, 2019, it is an unlawful discriminatory practice, "For an employer . . . to subject any individual to harassment because of an individual's [protected class] . . . regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories." Human Rights Law § 296.1(h). This provision is only applicable to Complainant's claims that accrued after October 11, 2019.

Complainant failed to offer credible evidence that Respondents subjected her to inferior terms, conditions or privileges of employment because of her membership in one or more protected categories after October 11, 2019. Complainant did not establish that Respondent Lawrence engaged in conduct towards her that subjected her to inferior terms, conditions or privileges of employment because of her sex after October 11, 2019. This claim is dismissed. Complainant also failed to establish that Respondent McMillian subjected her to harassment during their interaction on January 1, 2020. Complainant's testimony that Respondent

McMillian threw car keys at her or ranted like a "madman" was not credible, and his request to Complainant that she drive an assigned route is not harassment. This claim is dismissed.

Retaliation

It is unlawful for an employer to retaliate against an employee for having filed a complaint or opposed unlawful discriminatory practices. Human Rights Law § 296.7.

To make out a prima facie case of retaliation, a complainant must show that 1) he or she engaged in activity protected by the Human Rights Law, 2) the respondent was aware that the complainant participated in the protected activity, 3) he or she suffered an adverse employment action, and 4) there is a causal connection between the protected activity and the adverse employment action. *Adeniran v. State of New York*, 106 A.D.3d 844, 844, 965 N.Y.S.2d 163, 164-65 (2d Dept. 2013).

In a retaliation context, an adverse employment action is one which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Mejia v. Roosevelt Is. Med. Assoc.*, 31 Misc. 3d 1206(A), 927 N.Y.S.2d 817 (Table) (Sup. Ct. N.Y. Co. 2011), *aff'd.*, 95 A.D.3d 570, 944 N.Y.S.2d 521 (1st Dept. 2012), *lv. to appeal dismissed*, 20 N.Y.3d 1045, 961 N.Y.S.2d 374 (2013) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

If a complainant makes out a prima facie case of retaliation, the burden shifts to the respondent to articulate a legitimate, independent, and non-discriminatory reason for its actions. If the respondent does so, the complainant must show that the reasons presented by the respondent were merely a pretext for discrimination. *Adeniran* at 845, 965 N.Y.S.2d at 165.

Complainant engaged in protected activity when she filed six Division complaints in 2019, complained to Respondents about Respondent Lawrence's conduct on November 26,

- 29 -

2019, and repeatedly complained about not receiving her requested reasonable accommodation throughout 2019. Respondents were aware that Complainant engaged in protected activity, and Respondent City subjected Complainant to adverse employment actions when it initiated disciplinary charges against her on October 13, 2019, and in February 2020. Complainant also established a causal connection between the protected activity and the adverse employment actions given the temporal proximity between her complaints and the disciplinary charges.

Respondents articulated legitimate, independent, and non-discriminatory reasons for initiating disciplinary charges against Complainant. Despite receiving a warning on August 28, 2019, from Respondent City's Office of Legal Affairs, Complainant engaged in numerous instances of misconduct, including: sending an email to 30 email addresses on October 10, 2019, stating that Dabo-Nelson has an "unclean and tainted [past]" and that Dabo-Nelson and Astacio "needed to be removed"; publishing inappropriate tweets on her twitter account; speeding while driving for work, and multiple instances of disrespect in the workplace, among multiple other allegations. Respondent City initiated disciplinary charges against Complainant in February 2020 because she failed to complete the Family and Medical Leave Act paperwork provided to her and was absent without official leave.

Complainant failed to establish that Respondents' reasons were pretext. Respondent City submitted evidence supporting its October 13, 2019, disciplinary charges, including Complainant's emails and tweets, and there is no credible evidence that Complainant completed and submitted the requested Family and Medical Leave Act documentation. These claims are dismissed.

Other Claims

The four instant complaints contain numerous allegations concerning the entirety of

Complainant's employment with Respondents. Many of these allegations are vague, conclusory, and wholly unsupported by the evidentiary record developed at hearing. To the extent allegations in the complaints are not addressed in this recommended order, Complainant has failed to allege a prima facie claim of unlawful discrimination and they are dismissed.

## ORDER

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby ORDERED, that these cases be, and hereby are, dismissed.

DATED:    July 31, 2024
          Bronx, New York

Alexander Linzer
Administrative Law Judge